UNITED STATES OF AMERICA
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CR-201-1F

UNITED STATES OF AMERICA          )
                                  )
        vs.                       )          ORDER
                                  )
ARIC DEVON BLACKWELL,             )
              Defendant.          )

       This matter is before the court on Blackwell's motion for a new trial [DE-81]. After the

motion was fully briefed, the court noticed an evidentiary hearing on the motion for October 30,

2013. The Government was represented at the hearing by Assistant United States Attorneys

Nathan Huff and Eric Goulian and Blackwell was present with his attorney, Ms. Deborrah

Newton. At the conclusion of the hearing, the parties expressed interest in filing post-hearing

briefs on the matter, which the court allowed. The Government timely filed its post-hearing brief

[DE-103], and the deadline for Blackwell to file the post-hearing brief has expired. The matter is

ripe for resolution. For the reasons that follow, Blackwell's motion for a new trial [DE-81] is

ALLOWED, and the jury verdict [DE-66] is VACATED.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. Blackwell's Trial**

       On October 17, 2012, the Grand Jury returned a superseding indictment charging

Blackwell with possession with intent to distribute a quantity of marijuana, 21 U.S.C. § 841(a)

(count one), possession with intent to distribute a quantity of cocaine base (crack), cocaine, and

marijuana, 21 U.S.C. § 841(a) (count two), and conspiracy to distribute and possess with intent to

distribute five hundred grams or more of cocaine and twenty-eight grams or more of cocaine

base, 21 U.S.C. § 846 (count 3). Blackwell pleaded not guilty to all charges and proceeded to trial on November 13, 2012.

Despite the "not guilty" plea to count one, Blackwell admitted that he possessed marijuana with the intent to distribute it as charged in count one during the trial. With respect to count one, the Government's evidence demonstrated the following. Blackwell was traveling with approximately five pounds of marijuana when Sergeant Bradford with the Wake County, N.C. Sheriff's Department initiated a traffic stop. Blackwell initially stopped his vehicle, but when the officer returned to his patrol vehicle, Blackwell fled the scene. A high speed chase ensued, during which officers observed Blackwell throw a black trash bag from his window. Eventually, Blackwell pulled his vehicle over to the side of the road and fled on foot, but officers were able to apprehend him after a brief foot chase. The officers also recovered the trash bag containing marijuana from the side of the road. During his testimony, Blackwell admitted the conduct charged in count one.

However, Blackwell disputed both of the remaining counts at the trial. The Government's primary witness with respect to counts two and three was Willie Wheeles, who testified that he purchased both cocaine base and cocaine[1] from Blackwell approximately three times a week over a two-month period. Significantly, Wheeles stated that his cousin, Christopher Richardson, knew Blackwell and accompanied him to purchase the drugs on each occasion. Wheeles testified that Blackwell sold cocaine out of a trailer in Spring Hope, NC, and that a number of people were present at the trailer each time they purchased cocaine. Wheeles

---

[1] For purposes of simplicity, the court will refer to both the powder cocaine and cocaine base that Wheeles allegedly purchased from Blackwell as "cocaine" for the remainder of the order.

2

also testified that he knew Blackwell only by the name "Sean," though Wheeles identified Blackwell as the person from whom he purchased the cocaine in open court.

On cross examination of Wheeles, Blackwell's counsel sought to impeach Wheeles's credibility. Responding to cross examination, Wheeles admitted that he was testifying in the hopes of receiving a sentence reduction in his own federal felony drug case. Wheeles also admitted to being a drug dealer with multiple criminal convictions related to distributing cocaine and that he had received sentence reductions in the past in exchange for testifying against other defendants.

The remainder of the Government's evidence with respect to counts two and three consisted of testimony from various law enforcement officers. On the basis of Wheeles's statements that he purchased cocaine from Blackwell at the trailer and a controlled purchase of cocaine at the trailer, law enforcement officers obtained a search warrant for the Spring Hope trailer.[2] Although nobody was present at the trailer when the officers executed the warrant, officers recovered a large amount of powder cocaine, a small quantity of crack cocaine, a quantity of marijuana, and drug paraphernalia during the search. Officers also discovered a utility bill in Blackwell's name and several cars registered in Blackwell's name.

Sergeant Lewis, a deputy with the Nash County Sheriff's Office and a task force officer with the Drug Enforcement Administration, was the chief investigating officer in this case. On cross examination, defense counsel questioned Sergeant Lewis about the efforts he made to corroborate Wheeles's account that he purchased cocaine from Blackwell at the Spring Hope

---

[2] Officers refused to disclose the name of the confidential informant who purchased cocaine from the trailer, and there is no evidence in the record that the confidential informant purchased cocaine from Blackwell.

3

trailer. Sergeant Lewis testified that he had received information from other law enforcement agencies that Blackwell was selling cocaine at the trailer[3] and that Wheeles had cooperated in prior drug investigations and his statements in those investigations were found to be truthful and reliable. Sergeant Lewis also testified that the search of the trailer, in which officers recovered cocaine, cocaine base, marijuana, and drug paraphernalia, corroborated Wheeles's account. However, Sergeant Lewis noted that the drug containers recovered from the trailer were not submitted for fingerprint testing. Because Blackwell was arrested on the marijuana charge described above, Sergeant Lewis testified that law enforcement made the tactical decision to move forward with the search of the residence and Blackwell's indictment without conducting additional surveillance of the trailer or a "buy/bust" operation.

As part of his case-in-chief, Blackwell called his father, Calvin Blackwell. Calvin Blackwell testified that his son originally rented the trailer because his girlfriend Keisha Ellis needed housing. However, the relationship between Blackwell and Ellis eventually deteriorated and Ms. Ellis moved out of the trailer. Instead of terminating the rental agreement, Blackwell allowed several friends to live in the trailer. According to Calvin Blackwell, the trailer became a "party house" that various people would visit to drink alcohol, "cook out" and use drugs. Calvin Blackwell indicated that he personally observed at least three people sell drugs out of the trailer. However, Calvin Blackwell reported that he never observed Blackwell selling drugs out of the trailer.

---

[3] None of the officers who provided this information to Sergeant Lewis testified at the trial, and the court has no way of knowing how these officers were aware that Blackwell was allegedly selling cocaine at the trailer.

4

Blackwell also testified at the trial. Blackwell denied ever selling cocaine at the trailer and denied knowing Wheeles. Blackwell mostly corroborated his father's account regarding the drug activity at the Spring Hope trailer. After his relationship with Ms. Ellis ended, Blackwell testified that he allowed three friends to stay at the trailer. These friends payed rent by organizing a poker game and collecting a fee from the players. Blackwell confirmed his father's testimony that his friends sold cocaine and marijuana out of the trailer. Blackwell admitted that he visited the trailer occasionally to play poker, but he denied spending the night there after Ms. Ellis left. Finally, Blackwell testified that he tested "clean" every time his probation officer drug tested him prior to his arrest on the instant charges.

On November 16, 2012, the jury returned a verdict of guilty on all counts. However, as to count three, the jury found Blackwell responsible for less than 500 grams of cocaine and less than twenty-eight grams of cocaine base.

**B. Motion for a New Trial**

On April 29, 2013, while sentencing was pending, defense counsel filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure [DE-81]. Counsel indicates that on February 22, 2013, she received a letter from Mr. Christopher Richardson, who, according to Wheeles, was present with him during each of the drug purchases at the trailer. In the letter, Richardson denied ever accompanying Wheeles to the Spring Hope trailer to purchase cocaine from Blackwell. After receiving the letter, counsel immediately scheduled a tape-recorded interview with Richardson, who voluntarily agreed to the interview. Richardson again denied every buying cocaine from Blackwell during the interview. Richardson did not elect to secure counsel or ask for counsel during the interview.

5

As counsel was preparing the motion for a new trial, she met with the Defendant's father, Calvin Blackwell. Calvin Blackwell informed defense counsel that he had secured the handwritten letter from Christopher Richardson and mailed it to counsel. Calvin Blackwell also indicated that he had learned of a federal inmate, Isa Harnett,[4] who shared a holding cell with Wheeles while they both awaited their sentencing hearings before the undersigned. According to Calvin Blackwell, Harnett reported that Wheeles made comments that potentially suggested Wheeles committed perjury when he testified at Blackwell's trial.

After a phone interview with Harnett, counsel scheduled an in-person recorded interview for March 26, 2013.[5] At the interview, Harnett indicated that he was present in a holding cell with Wheeles after Wheeles was sentenced on federal drug charges before the undersigned and that Wheeles made statements potentially suggesting he testified falsely during Blackwell's trial. Specifically, in response to Harnett suggesting that Wheeles "did not know who [Blackwell] was,"[6] Wheeles stated "naw, I really didn't." Transcript of Isa Harnett Interview [DE-81-9] at 5. Harnett also stated that Wheeles "told me he (Wheeles) didn't know who Aric [Blackwell] was." *Id.* at 6.

---

[4] Throughout the briefing on this motion, Harnett's name is spelled in various ways, including "Isa Hardnett" and "Esa Hardnett." The court uses the spelling on his official court record, "Isa Harnett," Case No. 5:12-CR-100-1F, with the understanding that the court and the parties are all referring to the same person who testified at the October 30, 2013 hearing.

[5] Because Harnett is an inmate in federal custody, it took longer to arrange Harnett's interview than Richardson's.

[6] As explained in more detail below, Harnett was friends with Blackwell and knew that Wheeles testified against Blackwell at the trial at the time of this encounter.

6

Blackwell argues that the statements of Harnett and Richardson constitute newly discovered evidence warranting a new trial under Federal Rule of Criminal Procedure 33. After counsel for Blackwell and the Government fully briefed the issue, [DE-81, -92, -93, -95], the court noticed an evidentiary hearing for October 30, 2013.

## C. Hearing on Motion for a New Trial - Findings of Fact

Based on the evidence presented at the October 30, 2013 hearing, the court renders the following findings of fact. Defense counsel called Christopher Richardson as the first witness. Richardson's testimony was largely consonant with the statement he provided in his recorded interview with defense counsel. Richardson denied ever purchasing drugs from Blackwell. He testified that he knew Blackwell from informal "pick-up" basketball games, but that the basketball games were the only contact he had ever had with Blackwell. Richardson also stated that he had known Wheeles all his life, and that he knew Wheeles was a potential government informant. However, he also described Wheeles as a "straight up guy" because he had known that Wheeles was willing to help people in need in the past. Richardson adamantly denied accompanying Wheeles to the Spring Hope trailer to purchase cocaine from Blackwell.

Richardson also testified as to his whereabouts around the time of Blackwell's trial. Richardson stated that he has used his mother's address as his official address for several years. However, Richardson frequently stays overnight with various friends, though his mother typically knows where to find him. Richardson testified that it is generally easy to find him in the Spring Hope area and that he was staying in the region around Spring Hope at the time of Blackwell's trial. Richardson was not aware of the Blackwell trial when it took place in November, 2012.

7

Richardson became aware of Wheeles's testimony when Calvin Blackwell contacted him in February, 2013. Richardson ultimately agreed to write a letter denying Wheeles's testimony that Richardson and Wheeles purchased cocaine from Blackwell at the trailer. As described above, defense counsel immediately scheduled a recorded interview with Richardson, which Richardson voluntarily attended without legal representation.

Although Richardson denied the accusation that he was a drug dealer, he admitted that he had several criminal convictions, including probation violation, possession of marijuana, and underage drinking. A copy of Richardson's criminal recorded was admitted at the hearing and it reveals only those three convictions.[7]

Finally, Richardson denied ever meeting Sergeant Lewis, the chief investigating officer in this case, prior to the hearing. Richardson stated that he has never had any interaction with Sergeant Lewis about this case. The court notes that this testimony is inconsistent with defense counsel's brief, which indicates that "Lewis knows Richardson from town and routinely speaks to him." Mot. for New Trial [DE-81] at 12. However, the court has examined the transcript of the recorded interview with Richardson and the transcript is consistent with Richardson's statement at the hearing that he has never met Sergeant Richardson.[8] *See, e.g.*, Tr. of Christopher

---

[7] The Government states that Richardson has been convicted of possession of a controlled substance in prison. The court's reading of the criminal record is that this charge was reduced to possession of marijuana, to which Richardson pled guilty.

[8] The court is not noting this error for the purpose of criticizing defense counsel in any way. It was an understandable error in light of this voluminous record. The court notes it here because whether Sergeant Lewis met with Richardson in any capacity prior to Blackwell's trial is an important issue in this case. Whether Richardson's testimony at the hearing that he had never met Sergeant Lewis is consistent with his statements at the prior interview goes to Richardson's credibility, which is an important consideration for the court in the context of deciding a motion for a new trial on the basis of new witness testimony. *See United States v. Lighty*, 616 F.3d 321, 374 (4th Cir. 2010).

8

Richardson Interview [DE-81-6] at 30 ("I've never encountered him [Sergeant Lewis] first hand.").

Defense counsel next called Isa Harnett, who testified that he met Blackwell at the Wake County, NC Detention Center after Blackwell was arrested. Harnett, it turns out, was also facing federal drug charges before the undersigned.[9] Blackwell and Harnett became friends during their time at the Wake County jail. When they were both transferred to the New Hanover County Detention Center, they successfully obtained placement in the same "pod." Blackwell eventually showed Harnett portions of the discovery the United States Attorney turned over to him, which included Wheeles's name, his statement regarding Blackwell's drug activities, and his picture.

On January 15, 2013, Harnett and Wheeles were placed in the same holding cell in the federal courthouse in Wilmington to await sentencing. They were the only inmates in the cell. After Wheeles returned from sentencing, Harnett began questioning him about his sentence, letting on that he knew Wheeles had testified against Blackwell in the hopes of securing a sentence reduction. Harnett testified that he maintained a friendly, non-threatening tone throughout the conversation. Nevertheless, Wheeles "looked frightened" when Harnett brought up the Blackwell trial and he initially denied that he testified against Blackwell. Wheeles then became very quiet and did not want to speak to Harnett. However, Harnett later overheard

---

[9] After pleading guilty to possession with the intent to distribute twenty-eight grams or more of cocaine base, 21 U.S.C. § 841(a), Harnett was sentenced to seventy-two months imprisonment on January 15, 2013. United States v. Harnett, No. 5:12-CR-100-F. Harnett's case is currently on appeal. Ms. Lynne Reid, his appellate counsel, has also been appointed to represent Harnett for purposes of Blackwell's motion for a new trial. Ms. Reid attended the hearing and was available to Harnett during his testimony. Harnett did ask to stop the proceedings once and speak with his lawyer, which the court allowed.

Wheeles's lawyer state that Wheeles received a sentence reduction based on his assistance to the Government.

Harnett testified that when he overhead that statement he again asked Wheeles, in a non-threatening manner, whether he received a sentence reduction for testifying against Blackwell. At this point, according to Harnett, Wheeles admitted that he had testified against Blackwell. Harnett continued to question Wheeles about his involvement, and Wheless eventually stated that he "did not know" Blackwell and because he "did not know" him it was easy (*i.e.* not personally troubling) to testify that he purchased cocaine from him.[10]

After their sentencings, Harnett, Wheeles, and other inmates were placed on the same transport van. After the transport, Wheeles allegedly approached Harnett and thanked him for not telling the other inmates on the van that he had testified against Blackwell. Wheeles, according to Harnett, also asked Harnett whether he thought Richardson would be indicted based on Wheeles's testimony at Blackwell's trial. Wheeles allegedly told Harnett, "I didn't mean to get [Richardson] in trouble."

Defense counsel also called Calvin Blackwell. Calvin Blackwell testified that he learned of Richardson's role in the alleged drug dealing when he reviewed Blackwell's discovery. After discussing the trial with Blackwell in recorded detention center telephone conversations, Calvin

---

[10] In a classic lawyer debate, the parties dispute the meaning of the phrase "did not know." Defense counsel maintains that the phrase means that Wheeles had never met Blackwell and thus could never have purchased cocaine from him. The Government's position is that the phrase means that Wheeles did not know Blackwell well and it was easier to testify against someone he was not close to. Despite prodding from defense counsel, Harnett was not able to testify to precisely what Wheeles meant by the phrase.

10

Blackwell began looking for Richardson in the Spring Hope, N.C. area in approximately early February, 2013.

Calvin Blackwell testified that he found Richardson by traveling to the Spring Hope area, stopping a random person on the street and asking "where people hang out at," proceeding to that location (an illegal liquor house) and inquiring if anyone knew Christopher Richardson. Eventually, somebody admitted that he knew Richardson, and provided Richardson's telephone number. Calvin Blackwell attempted to contact Richardson on the cell phone number over the course of several days and eventually reached him. According to Calvin Blackwell, Richardson denied purchasing cocaine from Blackwell and denied accompanying Wheeles to the Spring Hope trailer. After consulting with his parents, Richardson agreed to provide a handwritten statement to that effect, which Calvin Blackwell delivered to defense counsel. Calvin Blackwell denied threatening Richardson to obtain the letter and denied any knowledge of Blackwell threatening Richardson.

On cross examination, the Government questioned Calvin Blackwell about his recorded detention center telephone conversations with Blackwell. Calvin Blackwell admitted talking to Blackwell about finding Richardson, but he denied that either of them made any threats regarding Richardson during the conversation.[11] In addition, the Government questioned Calvin Blackwell

---

[11] The transcript of the phone call indicates that Blackwell stated "he [Richardson] got one of two choices. Either he can try to, you know, look out or I'm going to hit him." Tr. of Recorded Detention Center Telephone Conversation [Gov.'s ex. 1] at 10. The Government admitted this transcript at the hearing as Government Exhibit 1. *See* Exhibit List [DE-100]. At the hearing, there was conflicting evidence about the meaning of the phrase "hit him." Sergeant Lewis testified that it can sometimes mean a defendant intends to provide information to the Government about an individual's drug dealing activities, in an effort to have the target individual indicted on federal drug charges. On cross examination, Sergeant Lewis also agreed that the phrase "hit him up" refers to an individual stating he plans to get into contact with someone. As explained above, the transcript reveals that Blackwell stated

regarding phone calls between the Defendant and various family members in which hearsay statements attributed to Calvin Blackwell indicate that he may have fabricated his description of the trailer as a "party house" when he testified at the trial. *See* Gov.'s Supplement to Sur-Reply Regarding Def.'s Mot. for a New Trial [DE-103] at 4-6 (providing quotations from relevant portions of the transcripts). Calvin Blackwell denied making the statements and denied fabricating his testimony at trial that the trailer was a party house.

Blackwell also testified at the hearing. Blackwell admitted that he knew Richardson from pick-up basketball games in the area, but he denied ever selling cocaine to him at the Spring Hope Trailer. Blackwell also testified that he attempted to find Richardson prior to turning himself in on the instant charges, but that he was unsuccessful. Because Blackwell could not find Richardson prior to the trial, he was not able to provide defense counsel with assistance locating him. Blackwell also testified that his understanding of Harnett's conversation with Wheeles was that Wheeles informed Harnett that he lied on the stand at Blackwell's trial to obtain a sentence reduction. Finally, Blackwell testified that he did not remember stating he would "hit" Richardson when he discussed finding Richardson with his father in the recorded telephone call. However, after Blackwell reviewed the transcript, he testified that "hit him" referred to contacting Richardson.

On cross examination of Blackwell, the Government focused on the recorded telephone conversation. Blackwell reiterated that when he said "hit him," he was referring to contacting Richardson in the sense of "hit him up." Blackwell denied that the phrase meant he planned to

---

"I'm going to hit him," not "I'm going to hit him up." Tr. of Recorded Detention Center Telephone Conversation [Gov.'s ex. 1] at 10.

provide the Government with information about Richardson's alleged drug dealing. Blackwell could not remember whether he stated that Richardson was "supposed to be indicted" during the phone conversation, but the transcript of the conversation reveals that he made that statement at least twice.[12] Tr. of Recorded Detention Center Telephone Conversation [Gov.'s ex. 1] at 11. Blackwell also denied that his statements during the phone call regarding the drug weight attributed to him in the presentence report suggest knowledge of the current street price of various quantities of cocaine. Blackwell maintained that his statements referred to the fact that the drug weights from his discovery were significantly less than the drug weights attributed to him in the presentence report.

After the defense rested, the Government called two witnesses: Sergeant Lewis and Willie Wheeles. Sergeant Lewis testified that he interviewed Wheeles after his arrest on federal drug charges. Sergeant Lewis denied making any promises to Wheeles regarding Wheeles's case, and denied making any suggestions that the photograph he showed Wheeles was the individual Sergeant Lewis wanted Wheeles to identify as a drug dealer. On cross examination, Sergeant Lewis indicated that he did not interview Richardson as part of the Blackwell investigation because Richardson was the target of a separate investigation. Sergeant Lewis

---

[12] Neither party addresses the "supposed to be indicted" statement in their briefs. In isolation, it might be considered an admission by Blackwell that he sold cocaine to Richardson. However, when read in the full context of the recorded conversation, the statement is far too ambiguous for the court to reach any definite conclusion: "[Blackwell to his father]: How he ain't picked up? How he ain't indicted? How a man tell on another man and he—you indict me, but you don't indict the man in the middle? You know what I'm saying? How the hell you going to indict him. He supposed to be indicted, too. Shit. *If—if he met me through him and he spent the money*, he testified that Chris [Richardson] made the calls, Chris [Richardson] spent the money; how in the hell Chris [Richardson] ain't locked up?" Tr. of Recorded Detention Center Telephone Conversation [Gov. ex. 1] at 10-11 (emphasis added). Although this statement possibly could be an admission, it also may be read as an expression of frustration that Wheeles lied to authorities about Richardson and Blackwell selling cocaine, but Blackwell was the only person indicted.

testified that interviewing Richardson as part of the Blackwell investigation would have alerted Richardson that Sergeant Lewis knew he was involved in drug dealing. Sergeant Lewis also testified that Richardson had become known to authorities as a possible local drug dealer when a confidential informant reported buying cocaine from Richardson. However, Sergeant Lewis refused to provide the name of the confidential informant and Richardson, for his part, adamantly denies that he has ever sold drugs. Richardson has never been charged with any type of drug trafficking offense.

Sergeant Lewis testified that, in his opinion, he had sufficient corroboration of Wheeles's statement to pursue Blackwell's indictment. The corroboration, in Sergeant Lewis's estimation, included the following: Blackwell was involved in a traffic stop in which officers recovered several pounds of marijuana shortly before his arrest, suggesting he was involved in selling drugs; officers recovered fairly large amounts of cocaine and smaller amounts of crack and marijuana, as well as drug paraphernalia, at a residence where the lease and utility bills were in Blackwell's name and which Blackwell was known to frequent; and the fact that a controlled purchase of cocaine was successfully conducted at the trailer.[13] In addition, Wheeles accurately described the location of the trailer and the type of cars typically parked at the trailer. Wheeles has also worked with Sergeant Lewis in prior cases, and according to Sergeant Lewis he has provided truthful and accurate information in those cases. On cross examination, Sergeant Lewis admitted that Blackwell denied living at the trailer and that witnesses at the trial had testified the trailer was a "party house."

---

[13] As defense counsel notes, there is no evidence that the confidential informant purchased cocaine from Blackwell during the operation.

The Government also called Willie Wheeles. Wheeles denied that he fabricated his testimony during Blackwell's trial in the hopes of obtaining a sentence reduction. Wheeles testified that nobody made him any promises regarding obtaining a sentence reduction in return for his cooperation efforts. He also stated that nobody asked him to lie or misidentify the person from whom he purchased cocaine at the Spring Hope trailer. With respect to the Harnett encounter, Wheeles testified that he was confronted by Harnett in the holding cell regarding his testimony at the Blackwell trial. Wheeles became afraid because he knew that his safety may be in jeopardy if other inmates learned he had testified for the Government. Wheeles was also concerned because he had been informed that individuals in the community had been threatening him and his family because he testified at the Blackwell trial. As a result, Wheeles initially denied testifying at the Blackwell trial when he was confronted by Harnett. However, Wheeles was forced to admit that he testified at the Blackwell trial when Harnett overheard Wheeles's lawyer state that he received a sentence reduction. Wheeles denied telling Harnett that he "did not know" Blackwell.

## ANALYSIS

Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Where the motion is based on newly discovered evidence, the motion must be filed within three years of the verdict.[14] *Id.* The five factors the court must consider on a Rule 33 motion are well-established:

(1) the evidence is newly discovered;
(2) the defendant exercised due diligence;

---

[14] Because this motion was filed within months of the verdict, the Government does not dispute the timeliness of Blackwell's motion.

15

(3) the newly discovered evidence is not merely cumulative or impeaching;
(4) the evidence is material; and
(5) the evidence would probably result in acquittal at a new trial.

*United States v. Moore*, 709 F.3d 287, 292 (4th Cir. 2013); *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010). "Without ruling out the possibility that a rare example may exist [the Fourth Circuit has] never allowed a new trial unless all five elements were established." *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001); *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993). Finally, jury verdicts are afforded deference and should be overturned only in "the rare circumstance where the evidence weighs heavily against it." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006).

## A. Newly Discovered Evidence

The Government does not challenge this factor, for good reason. As opposed to his identity, Richardson's statements denying involvement in Blackwell's alleged drug dealing were not known by either party prior to trial. These statements constitute "newly discovered evidence" under any common understanding of that term. *See United States v. Lawhorne*, 29 F. Supp. 2d 292, 304 (E.D. Va. 1998) ("First, the evidence must truly be 'newly discovered.' Where the defendant had knowledge of the evidence in question at the time of the trial, before the verdict, courts uniformly have held that Rule 33's more generous timing mechanism is unavailable.")

## B. Diligence on the Part of the Movant

To succeed on a motion for a new trial, facts must be alleged "from which the court may infer diligence on the part of the movant." *Fulcher*, 250 F.3d at 250; *Custis*, 988 F.2d at 1359. The Defendant must therefore allege facts from which the court may infer that he attempted to obtain the evidence prior to the trial. *See Fulcher*, 250 F.3d at 250 (upholding district court's

finding of diligence based on pre-trial efforts to discover the evidence). "'Diligence' means ordinary diligence, not the highest degree thereof; and diligence usually is determined by taking into account the composite knowledge of the defendant and his counsel." *Lawhorne*, 29 F. Supp. 2d at 305 (citing 3 Charles Alan Wright, *Federal Practice and Procedure* § 557, at 327–29 (2d ed. 1982)).

The Government maintains that Blackwell has not demonstrated that he diligently pursued this evidence prior to the trial. While the court agrees this is a close question, the court finds that Blackwell has alleged sufficient facts to demonstrate diligence. As a threshold matter, the court notes that Blackwell's counsel has made an affirmative declaration in her brief that she searched for Richardson prior to the trial. Mot. for New Trial [DE-81] at 3 ("Richardson was not available to the defense despite searching."); *id.* at 16-18 (noting that the defense team employed "exhaustive efforts to locate a Christopher Richardson, in the jail logs and Spring Hope area as described [by Wheeles] as his cousin"). In the absence of directly contradictory evidence, the court presumes that counsel, an officer of the court, would not include an outright falsehood in her brief. Although the brief does not go into great detail about Blackwell and his counsel's efforts to find Richardson, counsel represents that she searched the local prison and jail records and also searched the Spring Hope area prior to trial. Blackwell himself also states that he made some efforts to locate Richardson prior to turning himself in, including visiting a neighbor to inquire about Richardson's whereabouts. Aff. of Aric Blackwell [DE-81-1] at 2.

The court also finds that it can infer diligence from other facts contained in this record. As even the Government points out, Blackwell has aggressively litigated this case, filing approximately ten pre-trial motions. The pre-trial motions included a request for a reliability

17

hearing related to Willie Wheeles. The court finds that it can infer that the defense team searched for Richardson prior to trial based partly on defense counsel's diligence in other aspects of this case.

The court acknowledges that the Government advances several strong arguments regarding Blackwell's lack of diligence in attempting to find Richardson prior to trial. The Government notes that if Blackwell was having difficulty locating Richardson prior to trial, he could have requested a trial continuance. This argument is especially appealing in light of the fact that Wheeles stated that Richardson accompanied him every time Wheeles purchased cocaine from Blackwell. Assuming Blackwell's innocence, Richardson's potentially exculpatory testimony was critical to the defense and it is surprising that counsel would not have requested a continuance in this circumstance.

However, the court is reluctant to second guess Blackwell's trial strategy decisions in this regard. As Blackwell suggests, he could not be sure that Richardson would not have also lied in an effort to curry favor with the Government or possibly assist Wheeles in his federal drug case,[15] nor could he be sure that he could have found Richardson within the time frame allotted by the continuance. The court agrees with the Government that Blackwell made a strategic decision to go to trial without interviewing Richardson on the assumption that he could convince the jury that Wheeles was not to be believed. That decision turned out to be disastrous, but it was a

---

[15] The court notes here that the defense team did not know prior to trial that Richardson presumably is not involved in selling controlled substances. As such, it is at least plausible that Blackwell did not request a continuance on the assumption that Richardson would confirm Wheeles's (allegedly false) story in an effort to avoid indictment or secure a sentence reduction.

18

strategic decision all the same and the court is reluctant to find that Blackwell was not diligent on this basis.

   More importantly, the failure to request a continuance does not conclusively demonstrate that Blackwell was not otherwise diligent in attempting to find Richardson prior to trial. The Government disclosed Richardson's name approximately forty-one days prior to the trial. If Blackwell could not find Richardson within those forty-one days, it is possible Blackwell would not have been able to find him even if provided an additional thirty or sixty days. *See Lawhorne*, 29 F. Supp. 2d at 305 ("'Diligence' means ordinary diligence, not the highest degree thereof; and diligence usually is determined by taking into account the composite knowledge of the defendant and his counsel.'" (citing 3 Charles Alan Wright, *Federal Practice and Procedure* § 557, at 327–29 (2d ed. 1982))).

   The Government also relies on Richardson's statements that it is not difficult to locate him in the Spring Hope area and the fact that Calvin Blackwell was able to locate Richardson after only a few days of searching to demonstrate that Blackwell was not diligent in attempting to find Richardson prior to trial. Throughout these proceedings, Richardson has maintained that it is not difficult to find him in the Spring Hope area because the area has a relatively small population and many people in town know him. As explained above, although Richardson does not always reside at his mother's home, he does so frequently and his mother generally knows how to find him.

   Defense counsel maintains that she was not able to locate Richardson because Wheeles's statement to investigators, provided in discovery, referred to Richardson as Wheeles's "cousin." In an effort to whittle down the number of "Christopher Richardsons" in the Spring Hope area,

counsel searched the Spring Hope area for a Christopher Richardson related to Wheeles. Mot. for a New Trial [DE-81] at 16-17. At the hearing on this motion, Richardson denied that he is Wheeles's cousin, though he admitted knowing Wheeles for quite some time. Wheeles, for his part, maintained that Richardson is his "cousin by marriage." The court gives Blackwell the benefit of the doubt that efforts to find Wheeles were frustrated by the mistaken familial relationship.

In addition, while Richardson maintained that it was not difficult to find him in the Spring Hope area due to the limited population and the fact that many people in town knew him, he also acknowledged that he frequently stayed at multiple residences in and around the Spring Hope area. The lack of a fixed residence, even though his mother may have generally known where he was staying most of the time, lends credence to Blackwell's assertion that they were unable to find him despite searching.

The court also disagrees that Calvin Blackwell's ability to locate Richardson within a few days of searching suggests that Blackwell did not make reasonable efforts to find him prior to trial. The Government maintains that "Mr. [Calvin] Blackwell, a man with no legal or investigative training, was able to locate Mr. Richardson in less than four days." Gov.'s Supplement to Sur-Reply Regarding Def.'s Mot. for a New Trial [DE-103] at 9. While it may be true that Calvin Blackwell does not have any legal or investigative training, the court notes that Calvin Blackwell admitted on the stand that he went to an illegal liquor house to obtain Richardson's phone number. The court highly doubts that defense counsel or even defense counsel's investigator would have been allowed in an illegal liquor house, much less allowed to remain in the house while asking unfamiliar people for Richardson's phone number.

20

The court also notes that Blackwell's testimony that he had met Richardson only a few times while playing basketball was corroborated at the hearing by Richardson. Assuming this testimony is true, Blackwell could not have assisted his counsel with locating Richardson because he barely knew him. At least two courts have found that, in the context of a motion for a new trial based on an alleged constitutional violation, the lack of diligence by counsel should not be imputed to the Defendant. *See Lawhorne,* 29 F. Supp. 2d at 305 ("However, it has been held that 'a defendant raising a constitutional claim in a new trial motion based on new evidence need not excuse his lawyers' failure to discover the evidence at the time of trial with a showing of due diligence.'" (quoting *United States v. Torres,* 115 F.3d 1033, 1037 (D. C. Cir. 1997))). In this case, Blackwell does not allege that the Government committed a constitutional violation at trial that caused his allegedly wrongful conviction. However, the court finds this reasoning persuasive even in the absence of a constitutional violation, especially in a case where, as here, the Defendant has presented evidence that the sole witness tying him to the criminal conduct may have committed perjury.

In any event, the court finds that Blackwell has alleged sufficient facts from which the court may infer diligence in finding Richardson. Blackwell's counsel has represented that the defense team searched for Richardson prior to the trial and nothing in the record affirmatively contradicts that statement. Blackwell's counsel has aggressively litigated this case in many respects and the court has no reason to doubt that she did not also search for Richardson with the same vigor, although the search was ultimately unsuccessful. And contrary to the Government's assertions, the court is not convinced that Richardson could have easily been found if counsel had requested additional time or exercised ordinary diligence. Richardson did not have a fixed

21

residence and Wheeles's statement mistakenly indicated that Richardson was Wheeles's cousin, which likely frustrated efforts to locate him.

## C. Merely Cumulative or Impeaching Evidence

Blackwell also must demonstrate that the newly discovered evidence is not "merely cumulative or impeaching." *Moore*, 709 F.3d at 292; *Robinson*, 627 F.3d at 948. Evidence is impeaching where it tends to "discredit the veracity of a witness." *Robinson*, 627 F.3d at 949 (quoting *Black's Law Dictionary* 820 (9th ed. 2009)). Evidence that is merely impeaching typically "involve[s] . . . unrelated [matters], with issues that [have] no bearing on those at [the defendant's] trial." *Id.*; *Custis*, 988 F.2d at 1359-60. Of course, some evidence may serve both impeachment and exculpatory functions. *See United States v. Ellis*, 121 F.3d 908, 915 (4th Cir. 1997) (explaining FBI report had both exculpatory and impeaching functions). Exculpatory evidence is evidence that "goes to the heart of the defendant's guilt or innocence." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The court finds that Richardson's testimony is both exculpatory and impeaching. While it tends to cast doubt on Wheeles's testimony, it also "goes to the heart" of Blackwell's guilt or innocence. Wheeles is the only person who testified at Blackwell's trial and specifically tied Blackwell to distributing cocaine[16] and Wheeles indicated that Richardson accompanied him to the trailer each time he purchased cocaine from Blackwell. However, Richardson has now come forward and testified under oath that he never purchased cocaine from Blackwell and never accompanied Wheeles to the trailer. This evidence "goes to the heart" of Blackwell's guilt or

---

[16] The Government vigorously disputes Blackwell's position that Wheeles is the only person who ties Blackwell to the cocaine. The court addresses the Government's arguments below.

innocence as it directly contradicts the testimony of the sole witness who personally observed Blackwell allegedly distributing cocaine. Accordingly, his testimony cannot be considered "merely impeaching" evidence in the context of the Rule 33 standard. *See Custis*, 988 F.2d at 1359-60 (explaining merely impeaching evidence under the Rule 33 standard refers to evidence that is not related to the issues involved in the defendant's trial).

In an attempt to argue that this evidence is merely impeaching, the Government relies on *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010). In *Robinson*, the Fourth Circuit held that a rare exception may apply to the rule that merely impeaching evidence is typically not sufficient for a new trial under Rule 33. *Id.* at 949. The exception applies where "'the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases . . . .'" *Id.* (quoting *Custis*, 988 F.2d at 1359). The Government maintains that this case obviously does not fall within this exception, as there is no evidence in the record suggesting Wheeles lied in a string of previous cases.

The Government's argument fails to take into account the nature of the impeaching evidence in *Robinson*. The *Robinson* case presents a paradigmatic example of "merely impeaching" evidence. After Robinson's trial on felony drug charges, prosecutors learned that some of the officers involved in the case had committed misconduct, including improperly using police "buy money" to purchase alcohol and pay dancers at a club, improperly disposing of evidence, and drinking on the job. *Id.* at 946-47. Significantly, "none of the misconduct related to Robinson's case." *Id.* at 947; *see also Custis*, 988 F.2d at 1359 ("The state proceeding [in which officers were accused of the misconduct which constituted the newly discovered evidence]

involved an unrelated case, with issues hat had no bearing on those at Custis's trial."). For this

reason, the only purpose for which the new evidence in *Robinson* and *Custis* possibly could have

been used was impeachment. As the Fourth explained:

> If Robinson is instead contending that the misconduct evidence serves some purpose other than impeachment, we are at a loss as to what that purpose could be. Unlike the evidence in those few cases in which we have ordered or allowed a retrial, the misconduct evidence does not directly support some alternate theory of the crimes, nor does it provide any legal justification for Robinson's actions.

*Robinson*, 627 F.3d at 949 (citing *Fulcher*, 250 F.3d at 250-51).

In stark contrast to *Robinson*, this case involves evidence that directly contradicts the

Government's theory of the case. The "new evidence" in this case is Richardson's testimony that

he did not accompany Wheeles to the trailer to purchase cocaine from Blackwell. That

testimony, which Richardson provided under oath and subject to cross examination, directly

contradicts Wheeles's testimony regarding purchasing cocaine from Blackwell. To be sure,

Richardson's testimony impeaches Wheeles's credibility. However, it also supports the

"alternate theory of the crime[]" that Blackwell was not the person who sold cocaine to Wheeles

at the Spring Hope trailer. *Id.* Because this evidence has exculpatory as well as impeaching

functions, the court finds that Blackwell's testimony is not "merely impeaching" for purposes of

the Rule 33 standard.

**D. Materiality/Likelihood to Produce Acquittal**

The court finds that the fourth and fifth factors are intertwined and will therefore address

them together. If the evidence is such that it would likely produce an acquittal at a new trial, then

it is obviously material. With respect to the fifth factor, the court is required to make credibility

determinations when considering the "probability of acquittal." *United States v. Wilson*, 624

F.3d 640, 663 (4th Cir. 2010); *United States v. Kelly*, 539 F.3d 172, 189 (3d Cir. 2008). "'To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial.'" *Wilson*, 624 F.3d at 663 (quoting *Kelly*, 539 F.3d at 189). Finally, "in making this credibility determination, a district court should focus on whether a jury probably would reach a different result upon hearing the new evidence." *Lighty*, 616 F.3d at 374 (citing *Kelly,* 539 F.3d at 189).

In the court's view, the Government's best argument with respect to the fifth factor is that this evidence is not likely produce an acquittal because Richardson would not be expected to implicate himself in a federal drug crime. Essentially, the Government argues that the court should find that Richardson is not credible in light of his obvious self-interest. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001) (affirming district court where statements by a newly-discovered witness refuted the Government's key witness's account and district court found "[t]he court doesn't believe it would have made any difference in the credibility of the witness Jason Davis because the—this witness Brown or Peanut would naturally deny that he was involved in drug dealings with either defendant since to do otherwise, it would have incriminated him").

While the court acknowledges that this fact tends to discount Richardson's credibility, the court nevertheless concludes that Richardson's testimony is sufficiently credible, and, in light of all the evidence in this case, would likely produce an acquittal at a new trial. The court finds Richardson credible for two reasons: (1) in contrast to the Government's primary witness, the evidence that Richardson is involved in drug dealing is at best suspect, and at worst non-existent;

25

and (2) Richardson appeared before the court and testified under oath and subject to cross examination and the court found Richardson largely credible at the evidentiary hearing. The court will briefly explain these findings.

The Government alleges that Richardson is not credible because he is a "known drug dealer." However, the only evidence in the record suggesting that Richardson is a drug dealer is Sergeant Lewis's testimony that he has received information indicating Richardson sells cocaine. While the court does not suggest that Sergeant Lewis is not credible, the court has no way of determining the credibility of the persons who provided that information to Sergeant Lewis. There is no evidence that Sergeant Lewis has personally observed Richardson selling cocaine or any other controlled substance. In addition, Richardson's criminal record consists of convictions for possession of marijuana, underage drinking, and probation violation. In light of this minimal criminal record and the fact that Sergeant Lewis's testimony is based entirely on hearsay, the court cannot conclude that Richardson's credibility is suspect because he is a "known drug dealer." In fact, as explained below, the jury could likely find that Richardson is more credible than Wheeles, given his minimal criminal record relative to Wheeles's lengthy record.

More importantly, Richardson willingly attended the evidentiary hearing and testified under oath that he did not accompany Wheeles to the Spring Hope trailer. The court closely observed Richardson's demeanor and carefully considered his answers at the hearing, and, frankly, the court found his testimony credible. Richardson did not appear frightened as a result of possible threats from Blackwell or his family,[17] nor did he appear to be committing perjury.

---

[17] The Government places much emphasis on Blackwell's statement to his father, in which he indicated he would "hit [Richardson]" if Richardson did not "look out." The Government characterizes this as a threat and suggests that the threat "greatly diminishes the probative value of Mr. Richardson's

The court also finds it significant that Richardson has willingly participated at every stage of Blackwell's motion for a new trial. He has provided multiple sworn statements and he attended the evidentiary hearing and testified under oath and subject to cross examination. While it is true that Richardson's credibility is somewhat suspect because he likely would not implicate himself in a federal offense, his willingness to come forward and testify lends credence to his testimony. If he truly did not want to implicate himself in the offense, the court finds it unlikely that he would have provided sworn statements to defense counsel and subjected himself to cross examination from the United State's Attorney. Instead, he probably would have distanced himself from this case as much as possible.

Having found Richardson's testimony credible, the court turns to the question of whether this testimony is likely to produce an acquittal. As explained, the court must consider the new evidence in light of all the evidence weighed by the jury, and the question is whether the jury would probably reach a different result after hearing the new evidence. *Wilson*, 624 F.3d at 663; *Lighty*, 616 F.3d at 374.

As an initial matter, the court notes that much of the evidence the Government suggests corroborates Wheeles's testimony is not actually corroborative. For example, the Government emphasizes Wheeles's ability to provide directions to the trailer and the confidential informant's purchase of cocaine at the trailer as facts that corroborate Wheeles's testimony. However, Blackwell does not dispute that Wheeles purchased cocaine at the trailer; rather, Blackwell's

proposed testimony." Gov.'s Supplement to Sur-Reply Regarding Def.'s Mot. for New Trial [DE-103] at 17. Nothing in Richardson's testimony before the court suggested that he felt threatened to come forward and the court refuses to find that Richardson was not credible on the basis of these vague statements, especially where there is no evidence in the record that the threats were directly communicated to Richardson.

argument is that Wheeles purchased cocaine at the trailer from someone other than Blackwell. As explained, there is uncontradicted evidence in this record that multiple people congregated at the trailer. In addition, both the Defendant and Calvin Blackwell testified that multiple people (other than Blackwell) sold cocaine out of the trailer and the Government did not produce any evidence at trial or at the evidentiary hearing on this motion that would contradict this testimony. It is also the court's experience in the course of presiding over numerous drug trials that the record owner of a home where drugs are sold is not always the person actually selling drugs from the home. Accordingly, other than Wheeles's testimony, no evidence in this record directly ties Blackwell to cocaine dealing at the trailer, and Wheeles's ability to provide officers with directions to the trailer and the facts that a confidential informant[18] purchased cocaine from the trailer do not corroborate Wheeles's allegation that he purchased cocaine from Blackwell.

The Government also emphasizes the search of the trailer, in which cocaine, marijuana, and other drug paraphernalia were found, as corroborative of Wheeles's testimony. As explained above, however, nobody was present when the search was conducted and there is uncontradicted testimony in the record that the house was a "party house" in which multiple drug dealers frequently congregated. The Government's own primary witness testified that each time he purchased cocaine at the trailer, multiple people were present at the trailer. Thus, the court does not agree that the search of the house corroborates Wheeles's testimony that he purchased cocaine from Blackwell at the trailer.

---

[18] The court notes that this confidential informant has never testified, or, to the court's knowledge, identified Blackwell as the person from whom he purchased cocaine at the trailer.

28

For these reasons, the jury's verdict essentially resolves into a credibility determination between Wheeles and Blackwell, two individuals with a history of drug distribution. At Blackwell's previous trial, the jury obviously found that Wheeles was more credible than Blackwell. However, the jury did not have the benefit of Richardson's testimony at that trial, which largely refutes Wheeles's version of events. And as described above, Richardson has one drug conviction on his criminal record for possession of marijuana and there is no concrete evidence in the record that he is associated with drug dealing. Thus, the question with regard to the fifth factor essentially reduces to whether Richardson's testimony refuting Wheeles's testimony probably would produce an acquittal.

The court finds that it would. Wheeles has significant credibility problems, not the least of which is that he is testifying for a sentence reduction in his own federal criminal case and his lengthy involvement in criminal activities. Richardson, on the other hand, has one drug conviction for possession of marijuana and two other minor convictions, testified credibly before the court at the evidentiary hearing, and is exposing himself to perjury charges and other possible criminal charges if it is demonstrated that he has lied in this case. While it is true that the court would not expect Richardson to admit involvement in a drug conspiracy, that fact is true of every alleged criminal associate who comes forward and refutes the testimony of a Government witness. Surely that fact alone is not a sufficient reason to disregard Richardson's testimony.

In sum, the court finds that Richardson's testimony is such that it probably would produce an acquittal at a new trial, under the particular facts and circumstances of this case. The sole evidence, in the court's view, tying Blackwell to the cocaine counts in this case is Wheeles's testimony. Richardson has come forward and refuted Wheeles's testimony entirely and the court

finds that Richardson's testimony was credible. Accordingly, Blackwell has carried his burden as to the fourth and fifth factors as well.

## CONCLUSION

For the foregoing reasons, Blackwell's motion for a new trial [DE-81] is ALLOWED and the guilty verdict [DE-66] is hereby VACATED. Blackwell's sentencing in case 5:12-CR-201-F is hereby CANCELLED and the Clerk of Court is DIRECTED to remove the sentencing from the undersigned's criminal calendar. Blackwell's hearing on the motion to revoke his supervised release (5:04-CR-353-1F) is hereby CONTINUED to the court's August 4, 2014 term, though the court will reschedule this as needed as this case progresses.

The court will defer setting a new trial date until after the parties have had time to confer and the Government has decided whether it wishes to exercise its right to a direct appeal from this order. *See* 18 U.S.C. § 3731. In the event the Government chooses not to appeal, the parties are DIRECTED to confer and notify the deputy clerk by email of their preferred term of court for setting the new trial by **January 15, 2014**. The court's 2014 terms include: January 27, February 18, March 10, March 31, April 28, May 12, June 2, June 30, July 14, August 4, September 2, September 29, November 3, and December 1. However, the parties need to ensure that the Defendant's speedy trial rights are not affected by their selection. The speedy trial clock will begin to run on the date this order becomes final, which for present purposes will occur on the date the Government's deadline for filing an appeal expires[19] (on or about January 13, 2014 in this case) or the date the Government notifies the court and the Defendant of its decision not to

---

[19] Of course, if the Government appeals, the order will not become final until a final decision is reached by the appellate court.

appeal. *See* 18 U.S.C. § 3161(e); *United States v. Carpenter*, 542 F. Supp. 2d 183, 184-85 (D. Mass. 2008).[20] Absent continuances in which the speedy trial time is excluded, Blackwell's trial must occur within seventy days of the date on which this order becomes final. § 3161(e). Of course, as the parties are aware, they may request continuances of their chosen term of court with the speedy trial time excluded. *See* § 3161(h).

Although it does not appear that the court needs to exclude the time between entry of this order and the Government's deadline for filing an appeal, out of an abundance of caution, the court will exclude it. Because the Government has thirty days to decide if it wishes to appeal this order, the court finds that the ends of justice are best served by granting this extension and that they outweigh the interest of the public and the Defendant in a speedy trial. Accordingly, the delay occasioned by the granting of this extension shall be excluded from the speedy trial computation. *See* 18 U.S.C. § 3161(h)(7)(A).

---

[20] The court recognizes that there is some authority in the Fourth Circuit for the position that the speedy trial clock begins to run on the date the order granting a new trial is entered. In an unpublished decision, the Fourth Circuit explained, "[i]n this case, once the mistrial was declared, § 3161(e)(1) mandated that Staton had to be tried within seventy days 'from the date the action occasioning the retrial [became] final.' The action occasioning retrial was the declaration of the mistrial, and the speedy trial clock began the next day." *United States v. Staton*, 94 F.3d 643, 1996 WL 465841, at *6 (4th Cir. 1996) (unpublished table decision) (citing *United States v. Rivera*, 844 F.2d 916, 919 (2d Cir.1988)). However, as the *Carpenter* court explained, this interpretation does not take into account the "becomes final" language of the statute, which provides that the speedy trial clock resumes on the date the order granting the retrial "becomes final." *Carpenter*, 542 F. Supp. 2d at 184-85 (explaining that speedy trial clock cannot begin running on the date the order granting the new trial was entered because that order does not "become final" until the period in which the Government can file its notice of appeal expires). In both *Staton* and *Rivera*, the Fourth and Second Circuits were considering whether "the date the action occasioning the retrial" was the date of the mistrial order or the date of the resolution of the Defendants' interlocutory appeals on issues unrelated to the validity of the mistrial order, not the "becomes final" language and the parties were not contesting the date the mistrial order itself became final. *Staton*, 1996 WL 465841, at *2-6; *Rivera*, 844 F.2d at 918-919. In this case, the Government has an absolute right to appeal the order granting the new trial, and this order cannot "become final" until that period expires or the appellate process is exhausted.

31

SO ORDERED.

This, the _11_ day of December, 2013.

James C. Fox

JAMES C. FOX
Senior United States District Judge